IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Number: 3:24CR122-RCY-1 |
| | ) |
| WILLIAM THOMAS MORTON, JR, | ) |
| Defendant. | ) |
| | ) |
| | ) |

**DEFENDANT'S MOTION TO DISMISS COUNTS NINE, TEN, AND FOURTEEN UNDER THE SECOND AMENDMENT AND *BRUEN***

The right to buy and sell firearms is inherent in the right to keep and bear arms protected by the Second Amendment. Two statutes used in the indictment against Mr. Morton infringe that right, but have no historical analogue and therefore are invalid under the Second Amendment. The claim here is unique: *Heller* established that there is an individual right to keep and bear arms, and therefore the Second Amendment alone among the Bill of Rights protects a concrete fungible object.

**I.      Statutory Provisions and the Indictment**

Counts 9 and 10 allege violations of 18 U.S.C. § 922(a)(1)(A). That statute makes it unlawful for any person

> except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce;

1

18 U.S.C. § 922(a)(1)(A). Descending to particulars, the counts allege that Mr. Mahone, aided and abetted by Mr. Morton, "did willfully engage in the business of importing, manufacturing, and dealing in firearms" without a license.[1]

Count 14 alleges a violation of 18 U.S.C. § 922(a)(5). The statute provides:

(a)      It shall be unlawful—
. . .
    (5)      for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

18 U.S.C. § 922(a)(5). The particular violation alleged is that Mr. Morton "did willfully transfer, sell, trade, give, transport, and deliver a firearm . . . to a person [not a dealer], knowing and with reasonable cause to believe that said person was not then residing in the Commonwealth of Virginia," where Mr. Morton lived.

These statutes, in broad strokes, prohibit private citizens, without prior license from the state, from conducting ordinary business transactions involving firearms – either buying/selling

---

[1] Discovery so far does not indicate the basis for the grand jury's allegation that Mr. Mahone manufactured or imported firearms, it is assumed the government intends to proceed on a theory of "dealing in" firearms.

firearms with a profit motive over a period of time (§ 922(a)(1)(A)) or selling firearms to residents of another state (§ 922(a)(5)).

**II.   Argument**

The Second Amendment to the United States Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

The Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) held that for a firearms regulation to be constitutional under the Second Amendment, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Previously, the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), caused the Courts of Appeals (including the Seventh Circuit) to "coalesce[] around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125. Under this two-step test, the government could first justify the challenged regulation by "establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood." *Id.* at 2126 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)). If the government could not make that showing, the challenged law could still be upheld at the second step if the government showed and the court found (a) in the case of a law regulating "core" Second Amendment rights, applying "strict scrutiny," that the law is "narrowly tailored to achieve a compelling governmental interest"; or (b) for a law regulating any other Second Amendment-protected activity, that the regulation is "substantially related to the achievement of an important governmental interest." *Id.* (citations omitted).

*Bruen* rejected this framework and any form of "means-end" scrutiny applied to Second Amendment challenges, and eliminated the second step of the test. *Id.* at 2127 ("Despite the popularity of this two-step approach, it is one step too many."). Instead, to justify a challenged regulation as consistent with the Second Amendment, "the government must *affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* (emphasis added). Importantly, if the historical evidence presented by the government is "ambiguous" or unclear the government fails to meet its burden and the law is unconstitutional. *Id.* at 2139.

The Supreme Court rejected the use of intermediate scrutiny specifically because "federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures." *Id.* at 2131. But "judicial deference to legislative interest balancing . . . is not deference that the Constitution demands here." *Id.* The Supreme Court made clear that the relevant time period for comparison of regulated activity is 1791, when the Second Amendment was adopted. *See id.* at 2130 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*") (emphasis in original).

### A. *Bruen* Step One

Section 922(a)(1)(A) and 922(a)(5) (the firearms business restrictions) are unconstitutional under the test set forth in *Bruen* because they regulate conduct protected by the plain text of the Second Amendment as explained below—transfer of firearms. *See Bruen*, 142 S. Ct. at 2126.

The plain text of the Second Amendment, as understood by reference to history and ordinary public meaning, *see Heller*, 554 U.S. at 576-78; *Bruen*, 597 U.S. at 19–20, 31, covers the conduct at issue in § 922(a)(1)(A) and § 922(a)(5) —the right of one citizen to buy and sell firearms

4

to and from other citizens. The government cannot meet its heavy burden to show otherwise. The text of the Second Amendment itself, the right to "keep" firearms, necessarily includes the ability to purchase, sell, and otherwise transfer firearms. *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms.") The understanding of the text of the Second Amendment was always that it included the right to purchase and resell arms. *See Teixeira v. City of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("[T]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms."). And without the ability to acquire firearms or dispose of them through sale, the right to keep and bear arms would not be a meaningful right. *See Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937 (sales and transfers of firearms were not outside the scope of the Second Amendment).

Indeed, "[w]hat a marvelous, Second Amendment loophole" it would be if "Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms." *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023). The text of the Amendment does not support such an "absurd" reading. *Id.* The word "infringed" is used once in the Constitution, in the unqualified command of the Second Amendment. The Amendment does not simply protect the core of the preserved right of individual self-defense, but also any infringement or encroachment upon that right. Because § 922(a)(1)(A) and § 922(a)(5) encroach on the core right protected by the Second Amendment, it is unconstitutional. *See Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-CV-410, 2023 WL 3355339, at *7 (E.D. Va. May 10, 2023); *Teixeira*, 873 F.3d at 677 ("the

5

Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense.").

The text of the Second Amendment also points to the necessity of commerce in arms, since it aims to provide conditions for a "well regulated Militia." Indeed, the year after the Second Amendment was ratified in 1791, the Federal Militia Act of 1792 was passed which required that every man be armed. *See* Stephen Holbrook, *The Right of the People or the Power of the State: Bearing Arms, Arming Militias and the Second Amendment*, 26 Valparaiso Univ. L. Rev. 131, 195–98 (1991) (describing that the Act expressed a preference that individuals obtain their required arms from other individuals rather than from the government that might then seek to reclaim them); *id.* at 198–203 (describing state laws that required individuals to supply their own arms for militia duty).

The Second Amendment's enactment was significantly motivated by the desire for Americans to have the right to buy and sell arms and the historical evidence shows the right to engage in firearms commerce was widely recognized. *See* David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 234 (2014) ("In terms of the original meaning of the Second Amendment, the right to engage in firearms commerce is clear. It is one of the most important reasons why America's political dispute with Great Britain turned into an armed revolution."). The opposite of England's plan for America—which included banning manufacturing or selling guns in America—was the U.S. Constitution, which established "a guarantee of the right to buy, sell, and manufacture arms." *Id.* at 235. And Americans continued to believe that they had the right to purchase and sell weapons shortly after 1791. In 1793, for example, Thomas Jefferson noted that "[o]ur citizens have always been free to make, vend, and

export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 Writings 252–53 (P. Ford ed. 1895).

*Heller* itself supports a historically-grounded right to sell firearms. *See* 554 U.S. at 583 n.7, 615; *see also United States v. Marzella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) ("[C]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment."). And *Heller*'s reference to commercial regulations being "*presumptively* lawful" (as opposed to categorically or conclusively lawful) proves the underlying rule that there is a right to firearms commerce.[2] *See Marzella*, 614 F.3d at 92 n.8 (observing that a prohibition on the commercial sale of firearms would be "untenable under *Heller*."). Thus, it is clear that the Second Amendment's text protects the right of an individual to sell firearms.

**III.    There is No Historical Analogue to §§ 922(a)(5) or § 922(a)(1)(A).**

At the next *Bruen* step, the government must point to a historical practice of regulating the transfer of firearms that is similar both in its justification (the "why") and its method (the "how").

On this point, the government bears the burden, and Mr. Morton reserves for reply any comment on whatever regulations the government chooses to cite. But, anticipation, he does addres the popular pre-*Bruen* quote from the Ninth Circuit in *Teixeira* that "colonial governments substantially controlled the firearms trade." 873 F.3d at 685. A close look at the source cited in the following sentence of the opinion, stating that the "government provided and stored guns,

---

[2] Many of the cases deciding that § 922(a)(1)(A) is constitutional rely in part on the dicta in *Heller* regarding commercial regulations. *See, e.g., United States v. Kazmende*, No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (stating that "*Heller* made clear … that nothing in its opinion should be taken to cast doubt on longstanding laws imposing conditions and qualifications on the commercial *sale* of arms[.]"); *United States v. McNulty*, No. 22-10037-WGY, 2023 WL 4826950, at *5 (D. Mass. July 27, 2023); *United States v. Flores*, 652 F. Supp. 3d 796, 802 (S.D. Tex. 2023).

7

controlled the conditions of trade, and financially supported private firearms manufacturers[,]" shows that this "control[] of the firearms trade" had little to nothing to do with sales of firearms from private citizens of a colony to other private citizens of the colony. *Teixeira*, 873 F.3d at 685 (citing Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 49th Parallel, Vol. 34, at 6–8, 18–19 (2014)).

  The Smith article first discusses trade of firearms and beaver fur, deerskins and other goods between private citizens of colonies and Native American nations. Smith, *supra* at 6–8. That is very different from a private citizen of the United States selling guns retail to other private U.S. citizens (and these regulations were from decades before the founding and thus of questionable relevance). The colonies had an interest in preventing trade with foreign nations like the Native American tribes, who were often hostile towards the colonies, and it is not surprising that it would be regulated.

  The only other example cited by *Teixeira* from the Smith article was an initiative around the time of the Revolutionary War whereby colonies funded private armories to increase firearm production, i.e., "financially supported private firearms manufacturers." *Teixeira*, 873 F.3d at 685. This consisted of government funding for private gun manufacturers to produce *more* guns because the colonies needed them. Smith, *supra* at 18–19. It didn't require a license to do it. But if the government is funding it, typically some rules go along with the funding, so this again tells us nothing about laws like § 922(a)(1)(A), it simply tells us the government can condition funding on certain requirements.

  The government in other cases has also cited to isolated restrictions by certain colonies from exporting guns outside the colony. Aside from being from decades before or after the founding, this argument suffers from the same defect of the examples in the Smith article. As

Smith explains, European colonies were like foreign nations to each other, and colonies sometimes even used typically-hostile neighboring tribes as "buffers to intimidation from other European colonies, augmenting colonial forces when foreign invasion threatened." Smith, *supra* at 7. Thus, selling guns outside the colony was again like sending (exporting) arms to a foreign nation which may or may not be hostile and threatening invasion.[3] Like a United States citizen today engaging in formal trade with the government of a nation with which the United States was at war. Or even simply with the government of any foreign nation. It is not surprising that an individual would need a government license to do this and that violation of that requirement is criminalized under 22 U.S.C. § 2778, which states that "[i]n furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and export of defense articles[.]" Trade with a foreign nation without authorization from the government—the behavior regulated by the bans on trading with other colonies and requiring a license to trade with Indian nations—is obviously and distinctly different from selling guns to other private citizens.

Thus, the government cannot show any distinctly similar, or even relevantly similar, statute, much less a rich widespread tradition of such distinctly similar regulations as *Bruen* requires. In fact, the federal government did not require gun sellers to obtain licenses until 1938. *See United States v. Hosford*, 843 F.3d 161, 167 (4th Cir. 2016) (citing Federal Firearms Act, Pub. L. No. 75-785, 52 Stat. 1250 (1938)). Other firearm licensing requirements were enacted in the twentieth century by Hawaii and the District of Columbia. *See id.* at 16 n.1 (citations omitted).

---

[3] Several colonies in fact engaged in armed border confrontations with neighboring colonies. *See* Rohan Koosha Hiatt, *Constellating History: An Investigation into the Supreme Court's Treatment of Congressional Consent Under the Compact Clause*, 26 Lewis & Clark L. Rev. 275, 286 (2022)

These restrictions are too few and too far after the founding to establish a robust tradition under *Bruen*. *See Mance v. Sessions*, 896 F.3d 699, 713–14 (5th Cir. 2018) (rejecting the government's reliance on laws from 15 states between 1909–1939 regarding licensing or permitting as demonstrating "presumptively lawful" status, because it offered no evidence the challenged regulation had "a founding-era analogue or was historically understood to be within the ambit of the permissible regulation of commercial sales of firearms at the time the Bill of Rights was ratified"); *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937 (three state laws enacted 50 to 110 years after 1791 "fall[] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment.").

                                            Respectfully Submitted,
                                            William Thomas Morton, Jr.

By:                 /s/
                      Counsel
                      Joseph S. Camden
                      Va. Bar No. 92143
                      Assistant Federal Public Defender
                      Office of the Federal Public Defender
                      701 E. Broad St., Ste. 3600
                      Richmond, VA 23219
                      (804) 565-0830
                      Fax (804) 648-5033
                      joseph_camden@fd.org