IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Number: 3:24CR122-RCY |
| | ) |
| WILLIAM THOMAS MORTON, JR., | ) |
| Defendant. | ) |
| | ) |
| | ) |

**DEFENDANT'S REPLY RE: *BRUEN* AND TRAFFICKING**

Mr. Morton moved to dismiss counts 9, 10 and 14 of the indictment, alleging violations of 18 U.S.C. § 922(a)(1)(A) and (a)(5), under *Bruen*. He argued that these laws, which penalize engaging in the business of dealing in firearms without a license and selling a firearm to a resident of another state, infringe the right to keep and bear arms historically understood. *See* Josh Blackman, *The 1st Amendment, 2nd Amendment, and 3D Printed Guns*, 81 Tenn. L. Rev. 479, 490 (2011) (right to keep arms necessarily implies right to buy, which requires right to sell as "necessary consequence")

The government claims that obtaining a federal firearms business license is so simple that it's similar to the shall-issue regimes for personal concealed carry cited in *Bruen*, 597 U.S. at 15 & n.1 and, the government argues, implicitly approved when New York's "may-issue" regime was struck down. ECF No. 50 at 8. It claims one need only submit an application, pay a fee, and establish lawful premises. But the ATF itself lists 10 steps, including an in-person Industry Operations Investigator interview, preparation of a report, two levels of discretionary review before potential approval. https://www.atf.gov/resource-center/how-become-federal-firearms-licensee-10-easy-steps And in any case, that approval requires, in addition to business premises,

1

that the person not be disqualified.  So § 922(a)(1)(A) incorporates and depends on § 922(g), the constitutionality of which is also challenged in this case.

In any case, a prior licensing requirements for buying and selling firearms with a profit motive is an "infring[ement]" of the right, and the real question is whether a historical analogue to the FFL scheme or complete ban on interstate sales existed at the time the Second Amendment was adopted.  In response, the government relies almost exclusively on *Teixeira v. Count of Alameda*, 873 F.3d 670 (9th Cir. 2017), a pre-*Bruen* out-of-circuit case.  ECF No. 50 at 5-15 (citing *Teixeira passim*).  The government points only to two colonial-era statutes permitting sales within the colony, ECF No. 50 at 14; and early 1600s bans on selling "firearms and ammunition to Indians" as described by the *Teixeira* court.  *Id.* at 15.  Those statutes are about a hundred years too early to be relevant, and off point as well.  As Mr. Morton pointed out, those didn't restrict who could sell firearms, and the ones that banned sales to foreigners were targeted to prevent sales to those with whom the colonies were actively engaged in hostilities, which frequently occurred not just with Native Americans but with other colonies in the 1600s and early 1700s.  New Jersey (where the CI claimed he was from, according to the government's proffer) is not a hostile country, though there are no doubt some assertive and impolite people there.  Banning sales between states, all of whose residents possess the right to keep and bear arms, is not at all comparable to banning sales of arms to hostile foreigners.  There is no historical analogue to §§ 921(a)(5).

The *Teixeira* court shows obvious distaste for the fundamental nature of Second Amendment rights, even though firearms are the only physical objects whose possession and use are set out in the Bill of Rights as rights.  Imagine though, for a moment, a federal law requiring an approval process and license to buy and sell books, or banning the sale of books to residents of another state.  No problem, the government should say, because these are just commercial

2

restrictions that don't in the end keep anyone from getting their hands on books. And they could point to stronger precedent – Parliament, in the Printing Ordinance of 1643, "prohibited the printing, binding, or sale of books except by persons licensed under the authority of Parliament[.]"[1] Such an ordnance doesn't stand under the First Amendment, though. *Lovel v. City of Griffin, Ga.*, 303 U.S. 444, 451 (1938) (striking down city licensing requirement, "[T]he struggle for the freedom of the press was primarily directed against the power of the licensor."). Books are not guns, but obtaining and possessing and disposing of both is a fundamental constitutional right. This statute, which punishes with imprisonment licensing violations and sales to out-of-state residents, is unconstitutional on its face.

Respectfully Submitted,
William Thomas Morton, Jr..

By: _____/s/_____
Counsel
Joseph S. Camden
Va. Bar No. 92143
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0830
Fax (804) 648-5033
joseph_camden@fd.org

---

[1] https://firstamendment.mtsu.edu/article/printing-ordinance-of-1643/